IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

DARLENE MARROW,                      )
    Plaintiff,                       )
                              )
         v.                            )      Civil No. 3:13cv495 (JAG)
                              )
CAROLYN W. COLVIN,                   )
    Acting Commissioner of Social Security,  )
    Defendant.                       )
_____ )

## REPORT AND RECOMMENDATION

Darlene Marrow ("Plaintiff") is 50 years old and previously worked as a packer. On March 25, 2010, Plaintiff applied for Social Security Disability Benefits ("DIB") and Supplemental Security Income ("SSI"), stemming from fibromyalgia, arthritis, chronic pain, hypertension, back problems, high cholesterol and plantar fasciitis with an alleged onset date of April 10, 2008. Plaintiff's application was denied both initially and upon reconsideration. During a video hearing on April 4, 2011, Plaintiff testified before an Administrative Law Judge ("ALJ"). On April 28, 2011, the ALJ issued a written decision denying Plaintiff's claims. On July 26, 2013, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.

Plaintiff now appeals the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in assessing Plaintiff's credibility, failed to afford the Plaintiff's treating physician's opinion controlling weight and incorrectly found that Plaintiff could perform jobs existing in significant numbers in the national economy. The parties have submitted cross-motions for summary judgment, which are now ripe for review. Having reviewed the parties'

submissions and the entire record[1] in this case, the Court is now prepared to issue a report and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons that follow, the Court

recommends that Plaintiff's Motion for Summary Judgment (ECF No. 16) be DENIED; that

Plaintiff's Motion to Remand (EFC. No. 17) be DENIED; that Defendant's Motion for Summary

Judgment (ECF No. 19) be GRANTED; and that the final decision of the Commissioner be

AFFIRMED.

## I.   BACKGROUND

Because Plaintiff argues that the ALJ incorrectly determined Plaintiff's credibility, failed

to afford the opinion of Plaintiff's treating physician controlling weight and erred in determining

that Plaintiff could perform jobs existing in significant numbers in the national economy,

Plaintiff's education and work history, medical history, function reports, state agency physicians'

opinions, Plaintiff's testimony and vocational expert ("VE") testimony are summarized below.

A.  Education and Work History

Plaintiff was 47 years old when she applied for DIB and SSI.  (R. at 20, 35.)  Plaintiff

graduated from high school.  (R. at 35-365, 468.)  Plaintiff never a held driver's license and she

previously worked as a packer.  (R. at 36, 295.)

---

[1]     The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc.
R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of
birth (except for year of birth), and any financial account numbers from its consideration of
Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to
only the extent necessary to properly analyze the case.

B. Medical Records

1. Boydton Medical Center

On January 5, 2009, Plaintiff saw Rachel I. Huot, M.D. at Boydton Medical Center, complaining of pain in both of her shoulders, extending all the way down her left side. (R. at 944.) A physical examination revealed tightness in Plaintiff's trapezius muscles as well as tenderness and decreased range of motion in her spine; however, Plaintiff had no clubbing or edema in her extremities. (R. at 945.) Dr. Huot diagnosed Plaintiff with high cholesterol, essential hypertension and vitamin D deficiency. (R. at 945.)

On February 5, 2009, Plaintiff returned with complaints of depression and "always hurting somewhere." (R. at 946.) Dr. Huot diagnosed Plaintiff with depression and prescribed medication for hypercholesterolemia, fibromyalgia, hypertension and depression. (R. at 947.) On March 22, 2010, Plaintiff complained of problems with her right foot, left ankle, left knee and left hip. (R. at 1030.) The report indicated that Plaintiff did not take her antidepression medication, because it reacted poorly with her other medications. (R. at 1030.) Dr. Huot diagnosed Plaintiff with "pain in limb" and restless leg syndrome. (R. at 1031.)

On May 14, 2010, Plaintiff complained of pain in the right side of her jaw and of a new knot on her right foot. (R. at 1056.) Dr. Huot diagnosed Plaintiff with varicose veins, fibromyalgia, allergic rhinitis and neuralgia/neuritis. (R. at 1058.) Dr. Huot referred Plaintiff to a vascular clinic for varicose veins and a neurological consultation. (R. at 1058.) Plaintiff attended a follow-up visit on September 20, 2010, for her neck pain and nodules in her legs and feet. (R. at 1092.) Dr. Huot noted that Plaintiff's depression was under control even though Plaintiff was not on antidepressants. (R. at 1092.)

3

On October 28, 2010, Plaintiff returned, complaining of menstrual problems and neck pain. (R. at 1088.) Dr. Huot ultimately diagnosed Plaintiff with menorrhagia and GERD for which she was prescribed medications. (R. at 1090.) Plaintiff's last recorded visit at the Boydton Medical Center was on March 22, 2011. (R. at 1139.) At that time, Plaintiff complained of problems with her left knee, both of her shoulders and pain in her left eye. (R. at 1139.) Dr. Huot diagnosed Plaintiff with conjunctivitis and fibromyalgia for which she was prescribed medication. (R. at 1139.)

2. Halifax Regional Hospital

On September 20, 2008, Plaintiff went to the Emergency Room at Halifax Regional Hospital, complaining of pain in the top of her head that radiated down the left side of her face and into her left ear. (R. at 852.) During Plaintiff's evaluation, Plaintiff was alert and oriented, and she was not experiencing problems other than head pain. (R. at 853). Plaintiff walked normally and had no extremity tenderness. (R. at 854.) The primary diagnosis was a headache. (R. at 855.)

On October 31, 2008, Plaintiff underwent an MRI of her brain. (R. at 851.) The MRI showed no signs of acute or recent infraction; however, it showed a few FLAIR signal hyperintensities in the frontal lobe and a small arachnoid cyst. (R. at 851.) Overall, the assessment revealed no abnormal enhancement. (R. at 851.)

On September 15, 2010, Plaintiff went to the emergency room for neck pain and knots on the side of her neck. (R. at 1116-17.) John W. Steffe, M.D. diagnosed Plaintiff with cervical strain and insect bites. (R. at 1118.) Dr. Steffe noted that Plaintiff was alert and oriented to person, place and time. (R. at 1118.) Dr. Steffe also noted some spinal tenderness. (R. at 1118.)

Dr. Steffe prescribed Doxycycline, Fexoril and Vicodin and discharged her on the same day. (R. at 1119.)

    3.  VCU Health Systems

On March 27, 2008, Christopher Wise, M.D. completed a Fibromyalgia RFC Assessment in which he found that Plaintiff could sit and stand/walk for about two hours during an eight-hour work day. (R. at 733.) Dr. Wise opined that Plaintiff could rarely lift up to ten pounds, twist, stoop or bend. (R. at 733-35.) Dr. Wise also opined that Plaintiff could never crouch, climb ladders or stairs and that Plaintiff experienced significant limitations in her ability to do repetitive reaching, handling or fingering. (R. at 735.) Overall, Dr. Wise found that Plaintiff could not perform even low stress jobs and that Plaintiff would likely miss two days of work per month. (R. at 733, 735.)

On April 22, 2008, Plaintiff visited Dr. Wise at the VCU Rheumatology Clinic. (R. at 910.) Dr. Wise's report indicated that he had not seen Plaintiff since September 2007 and that no major changes had occurred in the interim, as Plaintiff still experienced pain. (R. at 910.) Plaintiff told Dr. Wise that her physical therapy helped some. (R. at 910.)

On June 11, 2008, Plaintiff saw Jonathan Isaacs, M.D. at the VCU Orthopedic Specialty Clinic. (R. at 996.) Dr. Isaacs' reported that he had treated Plaintiff for several years and that she "present[ed] with inconsistent complaints." (R. at 996.) Dr. Isaacs also noted that he could not interpret Plaintiff's provocative signs, because "they [were] everywhere." (R. at 996.) Dr. Isaac noted that Plaintiff was first diagnosed with carpal tunnel, but Plaintiff canceled the surgery that would have fixed it. (R. at 996.) Plaintiff then returned with complaints suggestive of radiculopathy, but an MRI showed no signs of it. (R. at 996.) Plaintiff gave vague, diffuse pain complaints, but a nerve study showed only carpal tunnel and no problems with the nerve.

(R. at 996.)  Dr. Isaacs generally noted that Plaintiff presented a difficult situation, because she

would appear for treatment, "get[] worked up, and then disappear[] for one and one-half years at

a time." (R. at 996.)  Dr. Isaacs further reported that Plaintiff's "complaints [were] always vague

and difficult to interpret." (R. at 996.)  Lastly, Dr. Isaacs reported that Plaintiff's exam that day

was "all over the place." (R. at 996.)

On July 2, 2008, Plaintiff returned to Dr. Isaacs.  (R. at 993.)  Dr. Isaacs reiterated his

observation that Plaintiff was "very inconsistent and ha[d] disappeared for long periods of time."

(R. at 993.)  Dr. Isaacs stated that he was "not really sure where all [Plaintiff's] discomfort [was]

coming from" and opined that Plaintiff could have fibromyalgia.  (R. at 993.)  On December 30,

2008, Plaintiff returned to Dr. Wise, complaining of pain "all over" and headaches.  (R. at 909.)

In his report, Dr. Wise questioned Plaintiff's diagnosis, noting "?Fibromyalgia? From outside

doc." (R. at 909.)  Dr. Wise also noted an MRI from 2006 that showed Plaintiff had c-spine

pathology.  (R. at 909.)  Dr. Wise refilled Plaintiff's medication and set up a three-month follow-

up.  (R. at 909.)

On February 19, 2009, Jonathan W. Berkenstein, M.D. treated Plaintiff for her chronic

headaches at the VCU Department of Neurology.  (R. at 955.)  Plaintiff had normal evaluation

results, and Dr. Berkenstein diagnosed Plaintiff with migraine variants for which a trial of

medications was prescribed.  (R. at 956.)

On March 29, 2009, Plaintiff returned to the VCU Rheumatology Clinic for a follow-up

with Dr. Wise.  (R. at 908.)  Plaintiff complained of chronic pain of an unknown cause and

constant aching.  (R. at 908.)  Dr. Wise also noted in his report that Plaintiff used a cane and had

reduced range of motion in her shoulders.  (R. at 908.)  Dr. Wise adjusted Plaintiff's medications

and scheduled a follow-up in four months.  (R. at 908.)  On June 1, 2009, Plaintiff returned to

Dr. Isaacs, complaining of pain in her left knee, hip and lower back.  (R. at 990).  Dr. Isaacs

diagnosed Plaintiff with IT band syndrome, prescribed Celebrex and directed Plaintiff to resume

her physical therapy exercises and to follow-up in three months.  (R. at 990-91.)

On July 21, 2009, Plaintiff had a follow-up at the VCU Rheumatology Clinic with Lenore

Buckley, M.D., complaining of chronic aches in her shoulders.  (R. at 903.)  Plaintiff's shoulder

pain would improve within about fifteen minutes of her getting up.  (R. at 903.)  Plaintiff had

tenderness in her shoulder, neck, thoracic spine and left leg, but she also exhibited good range of

motion and no synovitis.  (R. at 903.)  Dr. Buckley suggested that Plaintiff continue her

medications and attend an orthopedic consultation.  (R. at 903.)

That same day, at MCV Hospitals, Plaintiff had an x-ray performed of her left knee,

which showed mild, medial joint space narrowing with esteophyte formation in the medial tibial

spine, a small patellar enthesophyte, no fracture or joint effusion and no interval change since

May 11, 2005.  (R. at 1020.)  On April 21, 2010, Plaintiff returned to the VCU Department of

Orthopedic Surgery, complaining of pain in both feet that hurt "mostly first thing in the

morning," but that "never really got that much better during the day."  (R. at 1007.)  Plaintiff was

diagnosed with right foot plantar fasciitis and left chronic ankle pain or ankle sprain.  (R. at

1008.)  Plaintiff was directed to resume physical therapy.  (R. at 1008.)  An MRI of Plaintiff's

right foot showed mild, bilateral firs and metatarsal phalangeal joint osteoarthritis.  (R. at 1018.)

4.  Cox Rehabilitation Center

Plaintiff first attended physical therapy from February 13, 2008, through March 11, 2008,

and underwent a second round of physical therapy from April 8, 2008, to April 29, 2008.  (R. at

767-74, 777-90.)  Plaintiff's complaints included pain in her knees, shoulders, back and neck.

(R. 764-74.)  Plaintiff initially seemed to feel "looser" from the therapy, but her therapists noted

that Plaintiff did not experience any significant decrease in her pain. (R. at 764-74.) Plaintiff's therapist discharged her to home exercises on April 29, 2008, because she had not met any of her therapy goals. (R. at 764-74.)

Plaintiff's third round of physical therapy began on June 12, 2009, and ended July 14, 2009. (R. at 754-65.) During the course of this round of therapy, Plaintiff complained of pain in her lower back, hip and knee. (R. at 754-65.) Plaintiff further complained of trouble sleeping due to pain in her left leg. (R. at 755.) Plaintiff indicated that her pain decreased after treatment. (R. at 755.) When discharged, Plaintiff used a cane and her therapist noted that Plaintiff did not meet any of her treatment goals. (R. at 756.)

Plaintiff returned to physical therapy for a single visit on July 22, 2009, complaining of pains. (R. at 752.) Plaintiff measured her pain between a four and a six on a scale of one to ten. (R. at 752.) Plaintiff was discharged, because she had reached optimal benefit that could be achieved through therapy. (R. at 752.)

Plaintiff began a fourth round of physical therapy on April 29, 2010, which lasted until June 3, 2010. (R. at 1063-75.) Plaintiff's complaints included tenderness and pain in her ankles, heel, feet, toes and "all over." (R. at 1063-75.) On May 6, 2010, therapists noted that Plaintiff's "hypersensitivity [made] therapy difficult." (R. at 1067.) On May 18, 2010, however, the therapist noted that Plaintiff "progressed through exercises well." (R. at 1070.) On June 3, 2010, the therapist placed Plaintiff's treatment on hold until Plaintiff received a knee brace. (R. at 1064.)

Plaintiff's last round of physical therapy started on October 5, 2010, and ended on November 2, 2010. (R. at 1099-1115.) Plaintiff raised similar complaints of pain "all over." (R. at 1112.) Plaintiff also complained of pain in her right hand and neck and of tightness. (R. at

1099-115.)  Plaintiff's therapist discharged her, because of the lack of significant changes in Plaintiff's signs and symptoms.  (R. at 1099.)

 5.  Clarksville Family Practice

 On March, 31, 2009, Plaintiff returned to Dr. Huot with pain in her right foot and heel area.  (R. at 807.)  Vivia B. Whitfield, R.N. administered medication to Plaintiff and discussed exercises, including stretches, that Plaintiff could perform at home.  (R. at 807.)  Plaintiff returned on April 21, 2009, complaining of increased muscle pain and soreness when she turned over in bed.  (R. at 806.)  Nurse Whitfield gave Lyrica to Plaintiff for her pain and set a one-month follow-up appointment.  (R. at 806.)

 During a May 14, 2009 appointment, Christopher Mullins, D.O. noted that Plaintiff had "very unusual complaints."  (R. at 805.)  Plaintiff complained of shortness of breath and pain in her chest, especially across the sternum, in her left shoulder and through her left arm.  (R. at 805.)  Dr. Mullins administered a Medrol dose pack for fibromyalgia.  (R. at 805.)  On May 22, 2009, Plaintiff returned for a follow-up concerning her fibromyalgia.  (R. at 804.)  Plaintiff informed Nurse Whitfield that she had stopped taking Lyrica, because it caused drowsiness.  (R. at 804.)  Nurse Whitfield discontinued Plaintiff's Lyrica and placed Plaintiff back on Tramadol. (R. at 804.)

 On November 10, 2009, Plaintiff returned to refill her medication.  (R. at 800.)  During the appointment, Plaintiff complained of headaches, numbness in her feet and tingling and pain in her shoulders, knees and hips.  (R. at 800.)  Nurse Whitfield was "not sure what [was] going on with [Plaintiff]" and only knew what Plaintiff had told her.  (R. at 801.)  Nurse Whitfield also added: "[Plaintiff] just has a complicated history and not a lot of communication between all the providers that are caring for her."  (R. at 801.)  Plaintiff returned on December 30, 2009,

complaining of left hand pain and numbness. (R. at 799.) Nurse Whitfield diagnosed the pain as

arthritis and a carpal tunnel flare-up. (R. at 799.)

C. State Agency Physicians' Opinions

In June 2010, Martin Cader, M.D. completed a review of Plaintiff's medical history and

determined that the overall evidence suggested that Plaintiff could perform light work with

postural limitations and that Plaintiff was not disabled. (R. at 406-08, 416-17.) Dr. Cader

opined that Plaintiff could stand, sit, or walk for six hours in an eight-hour workday, could

occasionally lift or carry twenty pounds, could frequently lift or carry ten pounds and could push

or pull unlimitedly. (R. at 415.) Dr. Cader further opined that Plaintiff had no limitations in her

ability to balance and could occasionally stoop, kneel, crouch, crawl and climb ramps, stairs,

ladders, ropes and scaffolds. (R. at 415.) On September 2, 2010, Tony Constant, M.D. reviewed

Plaintiff's updated record and concurred with Dr. Cader's assessment that Plaintiff was capable

of light work with certain limitations. (R. at 428-33, 440-43.)

D. Function Reports

On April 28, 2010, Plaintiff completed a function report. (R. at 392-99.) Plaintiff

indicated that when she woke up, she had to sit on her bed to get her feet to act properly. (R. at

392.) Plaintiff could bathe, dress, cook, do laundry and clean, but she needed to take breaks due

to pain. (R. at 392-94.) Her pain caused her to wake up in the night, and she needed to sit down

to dress and bathe. (R. at 393.) She did not do yard work, but rode in a car, shopped for

groceries and household items, and paid the bills. (R. at 395.) Plaintiff's hobbies included

reading, cooking and watching television. (R. at 396.) She talked on the phone daily. (R. at

396.) Plaintiff could walk about 1,000 feet before needing a break of ten to fifteen minutes. (R.

at 397.)  Plaintiff also complained of crying spells.  (R. at 398.)  Plaintiff used a cane, braces and splints.  (R. at 398.)

On April 28, 2010, Plaintiff also completed a pain questionnaire.  (R. at 389-90.) Plaintiff reported headaches and pain down her left side and in her neck, hip, back, knee, ankle and feet.  (R. at 389.)  Plaintiff described the pain as aching, stabbing, burning, throbbing and cramping.  (R. at 389.)  Plaintiff indicated that the pain lasted "all day long" and that she experienced the pain every day.  (R at 389.)  Plaintiff attributed the pain to fibromyalgia, T-band syndrome in her left thigh, chronic nerve pain in her right foot, carpal tunnel, inflammation, disc disease in her neck and plantar fasciitis.  (R. at 389.)  Plaintiff noted that she had pain all over her body and that everything caused her pain.  (R. at 389.)  Her medications and exercises helped only a little.  (R. at 390.)

E.  Plaintiff's Testimony

On April 4, 2011, Plaintiff, represented by counsel, testified at a hearing in front of an ALJ.  (R. at 33.)  Plaintiff did not have a valid driver's license and explained that she never had one.  (R. at 48.)  Plaintiff lived with her husband and twenty-five year-old son in a mobile home in Clarksville.  (R. at 45-47.)  Plaintiff testified that her son was employed and that he moved back in with them to help out.  (R. at 45-48.)  Plaintiff graduated from high school and worked as a packer for ten years.  (R. at 35-36.)  Plaintiff had lost weight and, at the time, weighed 266 pounds.  (R. at 35.)

Plaintiff testified that she had fibromyalgia that caused her body to stay sore "all the time."  (R. at 36.)  She experienced pains in her neck and legs, and spasms in her back.  (R. at 36.)  The arthritis in her knees, back, hips and feet made it difficult for her to get in and out of her chair.  (R. at 36-37.)  She also testified to having carpal tunnel in her left hand.  (R. at 37.)

Plaintiff had trouble with gripping small items and lifting more than five pounds, because of carpal tunnel, arthritis and a bone that "popped" in her wrist. (R. at 37-38.) She was diagnosed with plantar fasciitis and a cyst in her feet for which she was told to wear a boot with a special-made liner. (R. at 37.) Plaintiff wore a soft cast on her left hand for carpal tunnel and one on her right hand for a popped bone in her wrist. (R. at 37.) Plaintiff received carpal tunnel release surgery on her right hand. (R. at 38.) Plaintiff sought treatment "all over the place" for her fibromyalgia. (R. at 39.) Plaintiff received medication and shots for fibromyalgia in her hip, hand and feet. (R. at 39.)

Plaintiff explained that she needed to lie down "off and on" during the day. (R. at 41.) Plaintiff estimated that she could stand ten to fifteen minutes before having to sit down and could walk with a cane about fifty yards before having to take a break. (R. at 45-46.) Plaintiff's daily activities, such as washing dishes, aggravated her pain and caused her to take frequent breaks. (R. at 41.) Plaintiff testified that she felt fatigued and also experienced swelling in her knees, ankle and hands. (R. at 46.)

Plaintiff completed home exercises to loosen her muscles every day. (R. at 44.) Plaintiff had good days and bad days. (R. at 44.) On good days, Plaintiff would wash dishes, but on bad days she would do nothing but lie on her bed or couch. (R. at 44.) Plaintiff hired someone to do her yard work and take out the trash, because she was unable to do so. (R. at 45.)

F.  VE Testimony

During the hearing, a VE testified that Plaintiff's past work as a packer qualified as unskilled and required light exertion. (R. at 49.) The VE testified that from a manipulative standpoint, Plaintiff was only limited in reaching overhead. (R. at 50.) The VE also testified that Plaintiff could not perform her past relevant work with this restriction. (R. at 50.) The VE

12

further testified, after considering age, use of a cane, education, and past work, that Plaintiff was functionally limited to unskilled, sedentary work. (R. at 50-51.)

The VE indicated that Plaintiff could perform jobs that existed in the economy. (R. at 51.) These jobs included working as a document preparer, with 23,000 positions in the national economy and 1,000 positions in Virginia; an addresser, with 24,000 positions in the national economy and 500 positions in Virginia; and, a surveillance system monitor, with 4,000 positions in the national economy and 200 positions in Virginia. (R. at 51.) The VE also testified that Plaintiff's psychological ailments would not impact her performance in these jobs due to their simple and repetitive nature. (R. at 52.) The VE specifically testified that the jobs that Plaintiff could perform were consistent with the *Dictionary of Occupational Titles* ("DOT").[2] (R. at 51.)

## II.    PROCEDURAL HISTORY

Plaintiff protectively filed for SSI and DIB on March 25, 2010, claiming disability due to fibromyalgia, arthritis, chronic pain, hypertension, back problems and high cholesterol with an alleged onset date of April 10, 2008.[3] (R. at 267, 274, 410.) The SSA denied Plaintiff's claims initially and on reconsideration. (R. at 173-82, 184-89.) On April 4, 2011, Plaintiff, represented by counsel, and a vocational expert testified before an ALJ. (R. at 33-54.) On April 28, 2011,

---

[2]     The DOT is a reference that the Department of Labor publishes listing and describing various jobs, and regulation authorizes its use in the disability review process. *Guiton v. Colvin*, 546 F. App'x 137, 140 n.5 (4th Cir 2013) (citing 20 C.F.R. § 404.1566(d)).

[3]     Plaintiff's filings for DIB and SSI indicate an application date of April 15, 2010. (R. at 267, 274.) However, the initial Disability Determination Explanation and the ALJ's decision indicate that Plaintiff filed for disability on March 25, 2010. (R. at 13, 410.) Both parties use March 25, 2010 as Plaintiff's application date. (Pl.'s Mem. at 1; Def.'s Mem. at 3.) Plaintiff's disability applications, the ALJ's decision, the Disability Determination Explanation and Defendant all indicate that April 10, 2008, was Plaintiff's alleged onset date. (Def.'s Mem. at 3; R. at 13, 267, 274, 410.) In one instance, Plaintiff's memorandum erroneously uses July 28, 2010, as Plaintiff's alleged onset date; however, the date was later corrected to April 10, 2008. (Pl.'s Mem. at 1, 20.)

the ALJ denied Plaintiff's application, finding that she was not disabled under the Act.  (R. at 13-22.)  The Appeals Council subsequently denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-6.)

### III.    QUESTION PRESENTED

1.  Did the ALJ err in assessing Plaintiff's credibility?

2.  Does substantial evidence support the ALJ's decision to afford less than controlling weight to Dr. Wise's opinion?

3.  Does substantial evidence support the ALJ's finding that Plaintiff could perform jobs existing in significant numbers in the national economy?

### IV.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence.  *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion.  *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'"  *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653).  In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  The Commissioner's findings

as to any fact, if substantial evidence in the record supports the findings, are conclusive and must

be affirmed regardless of whether the reviewing court disagrees with such findings.  *Hancock*,

667 F.3d at 477.  If substantial evidence in the record does not support the ALJ's determination

or if the ALJ has made an error of law, the Court must reverse the decision.  *Coffman v. Bowen*,

829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine

if a claimant is eligible for benefits.  20 C.F.R. §§ 416.920, 404.1520; *Mastro v. Apfel*, 270 F.3d

171, 177 (4th Cir. 2000).  An ALJ conducts the analysis for the Commissioner, and it is that

process that a court must examine on appeal to determine whether the correct legal standards

were applied, and whether substantial evidence in the record supports the resulting decision of

the Commissioner.  *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the

time of the application and, if so, whether the work constituted "substantial gainful activity"

("SGA").  20 C.F.R. §§ 416.920(b), 404.1520(b).  SGA is work that is both substantial and

gainful as defined by the Agency in the C.F.R.  Substantial work activity is "work activity that

involves doing significant physical or mental activities.  Your work may be substantial even if it

is done on a part-time basis or if you do less, get paid less, or have less responsibility than when

you worked before." 20 C.F.R. § 404.1572(a).  Gainful work activity is work activity done for

"pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).  Taking care of

oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are

not generally considered substantial gainful activities.  20 C.F.R. § 404.1572(c).  If a claimant's

work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to his past relevant work[4] based on an assessment of the claimant's residual functional capacity ("RFC")[5] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the

---

[4]    Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[5]    RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V.     ANALYSIS

### A.  The ALJ's Decision

On April 4, 2011, the ALJ held a hearing during which Plaintiff, represented by counsel, and a VE testified. (R. at 33-54.) On April 28, 2011, the ALJ rendered his decision in a written opinion and determined that Plaintiff was not disabled under the Act. (R. at 13-22.)

The ALJ followed the five-step sequential evaluation process in analyzing whether Plaintiff was disabled. (R. at 14-15); *see also* 20 C.F.R. § 404.1520(a). The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset of her disability. (R. at 15.) At steps two and three, the ALJ found that Plaintiff had the severe impairments of osteoarthritis, right foot plantar fasciitis, degenerative joint disease, hypertension, obesity, left carpal tunnel syndrome, fibromyalgia and depression, but that these impairments did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for the award of benefits at that stage. (R. at 15.)

Next, the ALJ determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that she required use of a cane, could not reach overhead and was limited to simple, routine, repetitive and unskilled work. (R. at 16.) In assessing Plaintiff's RFC, the ALJ found that, while Plaintiff suffered impairments, Plaintiff's statements describing the intensity, persistence and limiting effects of her symptoms were not credible, because they were inconsistent with the objective evidence and because Plaintiff's medical records lacked congruency between physicians. (R. at 17-19.)

At step four of the analysis the ALJ determined that Plaintiff could not perform her past relevant work as a caser/packer-labeler because of the levels of exertion that the positions required. (R. at 20.) At step five, after considering Plaintiff's age, education, work experience and RFC, and after consulting a VE, the ALJ found that Plaintiff could perform occupations that existed in significant numbers in the national economy. (R. at 20.) Specifically, the ALJ found that Plaintiff, regardless of her limitations, could work as a document preparer, addresser and surveillance system monitor. (R. at 21.) Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act. (R. at 21.)

Plaintiff moves for a finding that she is entitled to benefits as a matter of law, or in the alternative, she seeks reversal and remand for additional administrative proceedings. (Pl.'s Mot. for Summ. J. or in the Alternative, Mot. to Remand ("Pl.'s Mem.") (EFC No. 18) at 29.) In support of her position, Plaintiff argues that the ALJ incorrectly assessed Plaintiff's credibility, failed to properly afford controlling weight to Plaintiff's treating physician's opinion and erred in finding that Plaintiff could perform jobs existing in significant numbers in the national economy. (Pl.'s Mem. at 22-29.) Defendant argues that substantial evidence supports the ALJ's decision and that the ALJ applied the proper legal standards. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") (EFC No. 19) at 17-28.)

B.  The ALJ did not err in assessing Plaintiff's credibility.

Plaintiff argues that substantial evidence does not support the ALJ's determination regarding Plaintiff's credibility. (Pl.'s Mem. at 22-25.) Specifically, Plaintiff contends that congruency existed between Plaintiff's various treating physicians and that the objective medical evidence supports Plaintiff's complaints. (Pl.'s Mem. at 22-25.) Defendant maintains that substantial evidence supports the ALJ's determination. (Def.'s Mem. at 17-21.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a), 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could

produce the individual's pain or other related symptoms. SSR 96-7p at 1-3. The ALJ must

consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p at 5,

n.3; *see also* SSR 96-8p at 13 ("[The] RFC assessment must be based on all of the relevant

medical evidence in the record"). If the underlying impairment reasonably could be expected to

produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a

claimant's statements about the intensity and persistence of the pain and the extent to which it

affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take

into account "all the available evidence," including a credibility finding of the claimant's

statements regarding the extent of the symptoms and the ALJ must provide specific reasons for

the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *Eldeco,*

*Inc. v. N.L.R.B.*, 132 F.3d 1007, 10011 (4th Cir. 1997). The Fourth Circuit has determined that

"[w]hen factual findings rest upon credibility determinations, they should be accepted by the

reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. &*

*Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's

factual findings and credibility determinations unless "'a credibility determination is

unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason

at all.'" *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir.

1993)).

Furthermore, Plaintiff's subjective allegations of pain do not alone provide conclusive

evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). Instead,

"subjective claims of pain must be supported by objective medical evidence showing the

existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

When assessing Plaintiff's credibility, the ALJ determined that Plaintiff's statements describing the intensity, persistence and limiting effects of her symptoms were not credible, because they were inconsistent with the objective evidence and because Plaintiff's medical records lacked congruency. (R. at 17-19.)

Substantial evidence supports the ALJ's credibility assessment, because Plaintiff's complaints were inconsistent with the objective medical record. Although Plaintiff regularly complained of pain across her entire body, Plaintiff's extensive testing returned normal results with only occasional abnormalities. (R. at 39, 389, 717, 709-10, 909, 947, 996, 1063-75, 1112.) On October 31, 2008, an MRI of Plaintiff's brain revealed no abnormal enhancement or acute or recent infraction. (R. at 851.) On June 1, 2009, an exam revealed no evidence of fracture, spondylolysis or spondylolisthesis. (R. at 1021-23.) The exam also revealed minimal joint space narrowing and unremarkable soft tissue. (R. at 1021.) On July 21, 2009, an exam of Plaintiff's left knee revealed no fracture or joint effusion and unchanged joint space narrowing. (R. at 1020.) On March 23, 2010, a scan of Plaintiff's feet and ankles revealed minimal degenerative changes. (R. at 847.) On April 21, 2010, Plaintiff received another exam of her feet that revealed mild, bilateral firs and metatarsal phalangeal joint osteoarthritis with no evidence of fracture or dislocation. (R. at 1018.)

Moreover, Plaintiff's physicians recorded inconsistencies on numerous occasions. On June 11, 2008, Dr. Isaacs noted that Plaintiff's complaints were "inconsistent" and "always vague" and that "provocative signs are impossible to interpret as they are everywhere." (R. at 996.) On November 10, 2009, Nurse Whitfield also noted confusion regarding Plaintiff's

complaints when she wrote: "I am not sure what is going on with [Plaintiff]. All I know is what

she tells me." (R. at 801.) Dr. Wise also questioned Plaintiff's fibromyalgia diagnosis, when he

noted "? Fibromyalgia? from outside doc" in his report. (R. at 909.) Further, Dr. Isaacs noted

that Plaintiff "disappears for one and one-half years at a time" after treatment. (R. at 996.)

Furthermore, Plaintiff's own activities of daily living support the ALJ's determination.

Plaintiff reported that she was capable of dressing and bathing herself, although she had to sit

during these activities. (R. at 393.) Plaintiff could use the toilet without assistance and could

feed herself. (R. at 393.) She also prepared meals almost daily for herself. (R. at 394.) Plaintiff

could do laundry and clean the house with occasional breaks. (R. at 394.) She could ride in a

vehicle, shop for groceries, manage the household's finances, talk on the phone daily, read and

watch television. (R. at 395-96.) With the assistance of a cane, Plaintiff was able to walk about

1,000 feet without taking a break. (R. at 397-98.) Therefore, substantial evidence supports the

ALJ's assessment of Plaintiff's credibility.

C. **Substantial evidence supports the ALJ's decision to afford Dr. Wise's opinion less than controlling weight.**

Plaintiff argues that the ALJ erred in failing to afford Dr. Wise's opinion controlling

weight, because objective medical evidence supports his opinion. (Pl.'s Mem. at 25.) Defendant

maintains that substantial evidence supports the ALJ's decision. (Def.'s Mem. at 22-23.)

During the sequential analysis, when the ALJ determines whether the claimant has a

medically-determinable severe impairment, or combination of impairments that would

significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ

must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluation that have been ordered.

20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions,

22

including those from the Plaintiff's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. § 416.927(c)(2).  If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved.  20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p.  However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation; for example, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well-supported.  20 C.F.R. §§ 404.1527(d)(3)-(4), (e).  The ALJ must consider the following when evaluating a treating physician's opinion: (1) the length of the treating physician relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating physician; and (6) any other relevant factors.  20 C.F.R. § 404.1527(e)(1).

Here, because the opinions of Plaintiff's treating sources were either inconsistent with other evidence or lacking in support, the ALJ was forced to reconcile divergent opinions offered

by treating sources and those offered by state agency physicians.  Ultimately, the ALJ did not give controlling weight to Dr. Wise's Fibromyalgia RFC Assessment.[6]  (R. at 19-20.)

Dr. Wise opined that Plaintiff could sit and stand/walk for about two hours during an eight-hour work day.  (R. at 733.)  Dr. Wise also opined that Plaintiff could rarely lift up to ten pounds, twist, stoop or bend.  (R. at 733-35.)  Dr. Wise determined that Plaintiff could never crouch, climb ladders or stairs, and that Plaintiff experienced significant limitations in her ability to do repetitive reaching, handling or fingering.  (R. at 735.)  Overall, Dr. Wise found that Plaintiff could not perform even low stress jobs and that Plaintiff would likely miss two days of work per month.  (R. at 733, 735.)  The ALJ did not assign controlling weight to Dr. Wise's opinion, because it was inconsistent with other evidence of record.  (R. at 19-20.)

Substantial evidence supports the ALJ's determination to assign less than controlling weight to Dr. Wise's Fibromyalgia RFC Assessment on the basis that it was inconsistent with other medical evidence.  The Court first notes that Dr. Wise's Fibromyalgia RFC Assessment occurred before Plaintiff's alleged onset date of April 10, 2008, and Dr. Wise based this assessment on only three appointments in February, May and September 2007.  (R. at 731-35.)  After Plaintiff's alleged onset date, however, on December 30, 2008, Dr. Wise questioned Plaintiff's fibromyalgia diagnosis by writing "Fibromyalgia?" and "? Fibromyalgia? from outside doc?" on his report.  (R. at 909.)  On April 28, 2008, Dr. Wise reported that Plaintiff's physical therapy helped.  (R. at 910.)

On September 20, 2008, nurses at the emergency room at Halifax Regional Hospital noted that Plaintiff walked normally, had no extremity tenderness and appeared normal.  (R. at 854.)  On July, 21, 2009, Dr. Buckely, a doctor who worked with Dr. Wise at the VCU

---

[6]     In his opinion, the ALJ mistakenly refers to Dr. Wise as "Dr. Rice."  (R. at 19-20.)  In her memorandum, Plaintiff mistakenly refers to Dr. Wise as "Dr. Wisor."  (Pl.'s Mem. at 25.)

Rheumatology Clinic, noted that Plaintiff's pain improved within fifteen minutes of getting up. (R. at 903.) Further, Dr. Buckley noted that Plaintiff had good range of motion and no synovitis. (R. at 903.) On May 18, 2010, Plaintiff's therapist noted that Plaintiff "progressed through exercises well." (R. at 1070.)

Both Dr. Cader and Dr. Constant opined that Plaintiff was capable of light work with postural limitations. (R. at 406, 408, 416-17, 428-33, 439, 441-42, 443.) Dr. Cader noted that medical records indicated that Plaintiff could "move about within normal limits." (R. at 417.) Further, Dr. Constant noted that Plaintiff's condition was not severe enough to prevent her from working. (R. at 443.)

Dr. Wise's opinion was also inconsistent with Plaintiff's own reported activities of daily living. Plaintiff was capable of cleaning and dressing herself, as well as cleaning the house, doing the laundry, cooking almost daily, riding in a car, grocery shopping, managing household finances, watching television, reading and talking on the phone. (R. at 392-98.) With the use of a cane, Plaintiff could also walk about 1,000 feet. (R. at 398.) Consequently, substantial evidence supports the ALJ's decision to assign less than controlling weight to Dr. Wise's opinion.

D. **Substantial evidence supports the ALJ's finding that Plaintiff could perform jobs existing in significant numbers in the national economy.**

Plaintiff argues that the ALJ erred in finding that Plaintiff could perform jobs existing in significant numbers in the national economy. (Pl.'s Mem. at 25-29.) First, Plaintiff argues that the ALJ erred in finding that Plaintiff could work as a document preparer, addresser or surveillance system monitor, because Plaintiff's RFC is inconsistent with the DOT reasoning levels for these jobs and the ALJ failed to resolve the inconsistency. (Pl.'s Mem. at 26-28.) Second, Plaintiff argues that these jobs exist in such small quantities that she would be unable to

obtain work locally. (Pl.'s Mem. at 28-29.) Defendant responds that the requirements of these jobs are consistent with Plaintiff's RFC, that these jobs exist in significant numbers and that substantial evidence supports the ALJ's determination. (Def.'s Mem. at 24-28.)

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f). The Commissioner can carry her burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform, based on the RFC. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Further, when a claimant has an RFC that enables the claimant to perform work existing in the national economy, the inability to obtain work because of a lack of local work, cyclical economic conditions or a lack of job openings does not alter a finding of non-disability. 20 C.F.R. §§ 404.1566(c), 416.966(c).

Here, the ALJ posed the following hypothetical: "considering [Plaintiff's] age and now the use of the [cane],[7] her age, and education and past work, would there be other jobs that she would be considered capable of performing?" (R. at 50.) The VE responded that Plaintiff could perform the unskilled sedentary jobs of document preparer, with 23,000 positions nationally and 1,000 positions in Virginia; addresser, with 24,000 positions nationally and 500 in Virginia; and, surveillance system monitor, with 4,000 positions nationally and 200 in Virginia. (R. at 51.)

---

[7]  On page 50 of the record, the word "case" is incorrectly used in the place of "cane." (R. at 50.)

26

The VE also noted that Plaintiff's mental limitations would not impact the jobs previously listed. (R. at 51-52.)

Furthermore, the VE defined these jobs as "unskilled" and "consistent with the DOT." (R. at 50-51.) The ALJ also asked the VE whether the jobs identified consisted of "simple, repetitive work" and whether "simple, repetitive work" was "inherent in the definition of unskilled work." (R. at 52.) The VE responded that the jobs did consist of simple, repetitive work and that such work was inherently unskilled. (R. at 52-53.)

1.  The jobs identified by the VE are consistent with Plaintiff's RFC.

Plaintiff argues that work as a document preparer, addresser or surveillance system monitor is inconsistent with the ALJ's finding that Plaintiff had the RFC to perform "simple, routine, repetitive, unskilled work." (Pl.'s Mem. at 26; R. at 16.) Specifically, Plaintiff argues that the DOT-defined Reasoning Levels ("Reasoning Levels") for these jobs are inconsistent with an RFC of unskilled work. (Pl.'s Mem. at 26-28.) Defendant argues that the identified jobs are consistent with Plaintiff's RFC, because the Commissioner's regulatory scheme relies on skill levels and DOT-defined Specific Vocational Preparation Times ("SVP"), rather than on Reasoning Levels, to determine a plaintiff's capacity for work. (Def.'s Mem. at 25.)

The DOT defines the job of addresser as requiring a Reasoning Level of 2[8] and an SVP of 2. DOT § 209.587-018. The job of document preparer requires a Reasoning Level of 3[9] and an SVP of 2. DOT § 249.587-018. The job of surveillance system monitor requires a Reasoning

---

[8]   The DOT defines level 2 reasoning as the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and to d]eal with problems involving a few concrete variables in or from standardized situations." DOT, App. C.III.

[9]   The DOT defines level 3 reasoning as the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and to d]eal with problems involving a few concrete variables in or from standardized situations." DOT, App. C.III.

27

Level of 3 and an SVP of 2. DOT § 379.367-010. The DOT defines an SVP of 2 as any training "beyond short demonstration up to and including 1 month[.]" DOT, App. C.II.

The Commissioner's regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time . . ., and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed." 20 C.F.R. §§ 404.1568(a), 416.968(a). Moreover, an Administration ruling explicitly states that, " [u]sing the skill level definitions in 20 CFR 404.1568 and 416.968, *unskilled work corresponds to an SVP of 1-2 . . . .*" SSR 00-4p (emphasis added). Further, when an ALJ evaluates a plaintiff's ability to perform work in the national economy and determines the requirements of potential work, "the regulatory definitions of skill levels are controlling." SSR 00-4p.

Here, the ALJ properly assessed Plaintiff with the RFC to perform "simple, routine, repetitive, unskilled work." (R. at 16.) The three jobs identified by the VE during testimony all have an SVP of 2. DOT §§ 209.587-010, 249.587-018, 379.367-010. The Commissioner has determined that an SVP of 2 corresponds to the regulatory definition of unskilled work. SSR 00-4p. Because "the regulatory definitions of skill levels are controlling," the ALJ properly followed applicable regulations and rulings in finding that Plaintiff could perform unskilled work as an addresser, document preparer and surveillance system monitor.

Plaintiff also argues that SSR 00-4p required the ALJ to explain the alleged conflict between the VE's classifications of the jobs identified and the DOT classifications. (Pl.'s Mem. at 27-28.) Plaintiff suggests that a conflict exists between the VE testimony and the DOT, because Plaintiff's RFC limitation to unskilled work is inconsistent with the Reasoning Levels of the identified jobs. (Pl.'s Mem. at 27-28.)

SSR 00-4p, however, only requires an explanation and resolution of "an apparent unresolved conflict between VE . . . evidence and the DOT." SSR 00-4p. As discussed above, the Commissioner's regulations categorize work ability by SVP, not Reasoning Level. SSR 00-4p. Therefore, in the instant case, no apparent conflict existed for the ALJ to explain, because both the VE and the ALJ classified the identified jobs as unskilled — a classification consistent with the jobs' SVP of 2. DOT §§ 209.587-010, 249.587-018, 379.367-010; 20 C.F.R. §§ 404.1568(a), 416.968(a); SSR 00-4p (unskilled work corresponds to an SVP of 1-2).

Moreover, the record reflects that during testimony, the VE defined the three non-exhaustive jobs identified as "unskilled" and "consistent with the DOT." (R. at 51.) Furthermore, the ALJ asked the VE whether the jobs identified consisted of "simple, repetitive work" and whether "simple, repetitive work" was "inherent in the definition of unskilled work." (R. at 52.) The VE responded that the jobs consisted of simple, repetitive work and that such work was inherently unskilled. (R. at 52-53.) SSR 00-4p does not require that an ALJ "conduct an independent investigation into the testimony of witnesses to determine if they are correct." *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x. 369, 374 (6th Cir. 2006). Because no apparent inconsistency existed and the SVP levels of the jobs were consistent with Plaintiff's RFC, the ALJ properly complied with the regulations and SSR 00-4p.[10]

---

[10] Even assuming, *arguendo*, that the DOT reasoning level is dispositive of the skill level that the Commissioner's regulations require, multiple courts have affirmed decisions that found Reasoning Level 3 jobs to be simple, unskilled work. The Seventh Circuit rejected the Plaintiff's argument that a DOT reasoning level of 3 was inconsistent with the ALJ's restriction of plaintiff to "simple" work. *Terry v. Astrue*, 580 F.3d 471, 475, 478 (7th Cir. 2009). That court also decided that a surveillance system monitor, one of the jobs in question before this Court, qualified as simple work. *Id.* The Eighth Circuit decided that non-complex jobs could also have a DOT reasoning level of 3. *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007). The Eighth Circuit has also ruled that a job with a DOT reasoning level of 3 was consistent with "simple, concrete instructions." *Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 366-67 (8th Cir. 2007).

2.  The jobs identified by the VE exist in significant numbers in the economy.

Plaintiff also contends that the ALJ's ultimate finding was flawed, because the jobs identified by the VE exist in such small quantities that will make them overly competitive. (Pl.'s Mem. at 28.) Plaintiff's argument is unavailing, because when a claimant has an RFC that enables the performance of work existing in the national economy, a claimant's inability to obtain work due to a lack of work in claimant's local area, cyclical economic conditions or a lack of job openings does not change a finding of non-disability. 20 C.F.R. §§ 404.1566(c), 416.966(c).

Nevertheless, the record supports that these jobs indeed exist in significant numbers in the national economy. The VE indicated that Plaintiff maintained the ability to work as a document preparer, with 23,000 positions in the national economy and 1,000 positions in Virginia; an addresser, with 24,000 positions in the national economy and 500 positions in Virginia; and, a surveillance system monitor, with 4,000 positions in the national economy and 200 positions in Virginia. (R. at 51.)  Consequently, the ALJ did not err in finding that Plaintiff was able to perform jobs existing in significant numbers in the national economy.

## VI.    CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's Motion for Summary Judgment (ECF No. 16) be DENIED; that Plaintiff's Motion to Remand (EFC. No. 17) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 19) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable John

A. Gibney, Jr. and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/ _____
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: August 25, 2014